**DOAN THI HOANG ANH, Appellee,**

v.

**Johnny NELSON and Bonnie Nelson, Appellants.**

No. 3–59318.

Supreme Court of Iowa.

Sept. 22, 1976.

512

Boyle, Schuler & Stanton, Clear Lake, for appellants.

Pappas, McGuire & Folkers, Mason City, for appellee.

MOORE, Chief Justice.

This is a habeas corpus action by Doan Thi Hoang Anh (Anh), a refugee from Vietnam, to regain custody of her son Doan Van Binh (Binh) from defendants (Nelsons) in whose home the minor child had been placed for adoption by a Colorado child placement agency which had evacuated the child from Vietnam.

The trial court sustained the writ and specifically found Anh was Binh's natural mother; she had neither abandoned nor released Binh for purpose of adoption and concluded the best interests of the child required that he be returned to his natural mother. On this appeal by Nelsons they assert the trial court erred in each of its findings and conclusions.

I. Although habeas corpus was originally designed to test the legality under which a person was restrained of his liberty, it was long ago enlarged to encompass inquiries into the proper custody of children. *LaMar v. Zimmerman*, Iowa, 169 N.W.2d 819, 821; *Allender v. Selders*, 227 Iowa 1324, 1330, 291 N.W. 176, 179. Such actions are equitable in nature and we review them de novo. *McCalester v. Hillcrest Serv., Child. & Youth*, Iowa, 232 N.W.2d 1, 3; *Eddards v. Suhr*, Iowa, 193 N.W.2d 113, 116.

II. This habeas corpus action arises out of the incidents surrounding the end of United States involvement in Vietnam in April 1975. Binh was one of hundreds of Vietnamese children evacuated from Vietnam prior to the total collapse of the South Vietnamese government in "Operation Baby-lift." See *Nguyen Da Yen v. Kissinger*, 9 Cir., 528 F.2d 1194, 1197.

Plaintiff's trial evidence reveals that during the final days of the Saigon regime, Anh was able to escape death or capture by the Communists and take her seven children from their home in the central highlands to Saigon. Her husband, the father of all seven children, had previously been killed by the Communists. It was only after an incredible ordeal that Anh and the children were able to escape the same fate. At one point Anh had given one of the children saliva from her mouth so that he would not die from lack of water. After arrival in Saigon, Anh took her children to an orphanage known as Friends of Children of Vietnam (FCVN) on approximately April 23, 1975. Anh testified she believed she would perish when the Communists took the city. Under these dire circumstances she asked Ross Meador, a representative of FCVN, if he could take her children out of the country. She gave him the name and age of each child. At no time did she sign either a written release or consent to the adoption of her children by other people. In fact, she refused to sign a consent form and instructed her oldest daughter to keep all the children together for two years. Additionally, she succeeded in securing the Denver, Colorado address of FCVN for the purpose of tracing her children's whereabouts if she survived.

Defendant's exhibits include an affidavit sworn to on August 26, 1975 by Cherie Clark, Overseas Director of FCVN which states Anh released her child, Doan Van Binh, verbally and physically to Ross Meador. Meador did not testify.

Soon after leaving the children with FCVN Anh, with other refugees, escaped from Saigon aboard a fishing boat. She traveled first to Singapore, then to the Philippines and eventually reached Wake Island. From there she was flown to Camp Pendleton, California where she arrived on August 5, 1975. There she immediately contacted the Red Cross for information about her children and learned FCVN had taken them to Denver. She resolved to

regain custody of the children as soon as she was located.

Sponsored by three Methodist Church groups, Anh moved to Great Falls, Montana on September 12, 1975 where she continued to reside at trial time, March 4, 1976. On September 28, 1975 Anh succeeded in regaining custody of four of her children who had been staying in the Denver home of an FCVN official. The four children ran toward Anh screaming "Mommy, Mommy" when she arrived at the official's home. The meeting of the official and his wife with Anh was warm and effusive. Anh there learned two younger children had been placed in foster homes and that Binh was with the Nelsons in Forest City, Iowa. Following defendants' voluntary request and application for a Vietnamese child, the Denver FCVN officials on May 3, 1975 placed Binh with the Nelsons for the purpose of adoption.

After learning Binh's whereabouts, Anh instituted an intensive campaign through various social agencies to regain his custody. Their reports recognized her as Binh's mother and did not seriously question her right to custody.

Nelsons were understandably upset as they had in good faith taken Binh into their home and treated him with the same love and affection as that which they had for their minor daughter and son. At trial time they were respectively 6 and 4 years of age. They sent a letter to Anh imploring Anh to let them raise her son. Later they sent their Minister, Rev. John Jerry Shep, as an emissary to Great Falls to determine whether Anh's claims to Binh were meritorious. He was treated courteously and with full cooperation by Anh and her sponsors. He found Anh and the four children living in a modest, well-furnished, clean and adequate apartment. He visited for several hours with Anh and, although he had difficulty understanding her, was apparently satisfied she was Binh's natural mother. His only rather shocking report was that Anh had said each of her seven children had a different father. Anh denied this in her trial testimony. We find it unnecessary to

resolve this dispute because we think the result in the appeal must be the same in either event.

When Nelsons proved unwilling to release Binh to Anh she commenced this habeas corpus action on February 6, 1976. Nelsons' answer to her petition denied she was Binh's natural mother, alleged she had abandoned and released the child, and asserted Binh's best interests would be served by denial of Anh's request for his custody.

As already stated the trial court found against defendants on each of the issues thus raised. Logical well-prepared findings of fact and conclusions of law were filed by the trial court. We give the trial court's findings weight in our de novo review, especially when considering credibility of witnesses, but we are not bound by them. Rule 344(f) (7), Rules of Civil Procedure.

III. We first consider the issue of whether the record establishes Anh is Binh's natural mother. At trial, March 4, 1976, Anh testified in support of her claims and positively identified Binh as her child. After describing the events surrounding her escape to Saigon and ultimate pilgrimage to FCVN Anh's testimony includes:

"Q. You believed your children were coming to an orphanage that belonged to the United States government? A. Yes.

"Q. Now, Miss Anh, you have seen the little boy that's here in the court room, haven't you? A. I see. When I went inside.

"Q. Can you tell from looking at him whether he is your son? A. I just walked in the door and I knew this, that is my son. Other way we keep love in deep deep in the heart. I would like to hold my boy, but I no can do this.

"Q. But is there anything about your son that makes it easy for you to identify him, any physical features? A. My boy had two dimples and one ear infection.

"Q. This ear infection, how did that happen, do you know? A. That hap-

pened the one time they throw hand grenade. Vietnamese commands walked by our house, but all my children didn't make it in outside.

"Q. You are saying that your son's ear was injured when a grenade was thrown and you weren't able to grab all your children? A. Yes.

"Q. When was this son born to you. A. He born the 19th of May 1972.

"Q. You said that most Vietnamese don't remember the birth dates of their children? A. Most they don't.

"Q. But this child was born on Ho Chi Minh's birthday and you were very frightened on that day? A. Yes.

"Q. Now, Miss Anh, do you have any— well, excuse me, did you receive any kind of a birth certificate or any kind of paper when your child was born? A. My child born—come help us. We also had—

"Q. You say you had birth certificate for every child? A. Yes.

"Q. Where are those birth certificates now? A. When we run out of central to Saigon, we no carry anything with us so we don't have no birth certificates with me now.

\* \* \*"

We note the record includes ample documentation that Binh does suffer from a perforated right ear drum and has two dimples.

During her testimony Anh produced two pictures in support of her claim that Binh is her son. Exhibit C is a picture taken in Vietnam when Binh was eight months old. Exhibit D is a picture taken by Nelsons which they enclosed in their letter of October 1, 1975 to Anh. Exhibit A included a newspaper photo of Binh and the Nelson family. These photographs show certain identifiable similarities of ears, mouth, eyes and expression although the age discrepancies between the pictures in comparing an eight-month-old baby to a three-year-old boy prevents positive identification.

Nelsons offered no evidence to contradict the direct and circumstantial evidence that Anh is Binh's natural mother.

Our de novo review brings us to agree with the trial court's finding and conclusion:

"Anh is a credible witness and her testimony, together with the substantial inference arising from the other circumstances, results in the firm conclusion that Doan Thi Hoang Anh is Doan Van Binh's mother."

■ IV. Nelsons next contend that even assuming, arguendo, Anh is Binh's natural mother, she nevertheless abandoned her child in Saigon during the final days of the South Vietnamese regime in April 1975.

The concept of abandonment is not new to this court. However, most of our cases where we have found abandonment relate to conflicts between relatives who have reared a child from infancy and the natural parent who after a period of several years desires to assert parental rights. They include *Childers v. Childres*, 257 Iowa 1132, 136 N.W.2d 268; *Carrere v. Prunty*, 257 Iowa 525, 133 N.W.2d 692; *In Re Guardianship of Plucar*, 247 Iowa 394, 72 N.W.2d 455 and *Joiner v. Knieriem*, 243 Iowa 470, 52 N.W.2d 21. Each is readily factually distinguishable from this case.

In *Pitzenberger v. Schnack*, 215 Iowa 466, 469, 245 N.W. 713, 714, we state:

"To constitute an abandonment, there must be a relinquishment or surrender of rights or property by one person to another; a giving up; a total desertion. It includes both the intention to abandon and the external act by which the intention is carried into effect."

We are wholly unable to see how Anh's relinquishment of her children to FCVN could be construed as an indication to abandon them. On the contrary, her relentless search for them in this country affirmatively manifests her intention to meet her parental duties and obligations.

In 2 Am.Jur.2d, Adoption, section 33, at pages 887–888, the editor states:

"Voluntary abandonment, as used in adoption statutes, *does not include an act or course of conduct by a parent which is done through force of circumstance or dire necessity*, but relates to intentional and wilful acts, or a course of conduct implying conscious disregard or indifference to parental obligations to the child, or a settled purpose to be rid of those obligations and to forgo all parental rights. The factual question must be determined by ascertaining the mental attitude and intent of the parent; there must be both the intention to abandon and the external act of abandonment. It has been said that silence and inaction of the parent must be prolonged to such a point that an intention to abandon the child must be inferred as a matter of law. Mere involuntary separation from a child or loss of its custody is alone insufficient to constitute an abandonment which dispenses with consent, but coupled with more definitive factors, such as imprisonment of the parent, may be deemed sufficient to establish abandonment." (Emphasis added).

It is difficult to imagine an instance of dire necessity more extreme than that here disclosed.

Like the trial court, we find and hold Anh did not abandon her child Binh when she left him at the FCVN facility in Saigon.

V. In addition to their abandonment argument Nelsons contend Anh "released" Binh to FCVN for the purpose of adoption. They rely on the statement in Cherie Clark's affidavit that "Hoang Anh released her child verbally and physically to Ross Meador, a staff member of Friends of Children of Vietnam." Meador did not testify. Anh specifically under oath denied releasing Binh for adoption. Circumstantial evidence strongly supports her denial.

■ Additionally we note the law is well established that surrender of the custody by its parents is presumed temporary unless the contrary is made to appear by proof, clear, definite and certain. *Adair v. Clure*, 218 Iowa 482, 486, 255 N.W. 658, 660; *Risting v. Sparboe*, 179 Iowa 1133, 162 N.W. 592, 594; *Miller v. Miller*, 123 Iowa 165, 169, 98 N.W. 631, 633. We find no such proof in this record.

■ Neither party pleaded any statute from another jurisdiction as required by rule 94, R.C.P. Neither party attempted to prove Vietnamese law was applicable to any issue raised in this case. Therefore it must be presumed foreign law both statutory and common law is the same as ours. We may not take judicial notice of foreign law in the absence of such pleading and proof. *Zeman v. Canton State Bank*, Iowa, 211 N.W.2d 346, 349 and citations. See also 31A C.J.S. Evidence, § 133; McCormick on Evidence, 2nd Ed., section 335, pages 779–781.

Sections 238.26 and 238.27 of our 1973 Code are applicable to the issue of release:

"*Section 238.26 Relinquishment of rights and duties*

"*No person may assign, relinquish, or otherwise transfer to another his rights, or duties with respect to the permanent care or custody of a child under fourteen years of age unless* specifically authorized or required so to do by an order or decree of court, or unless *the parent or parents sign a written release attested by two witnesses, of the permanent care and custody of the child to an agency licensed by the state director.*" (Emphasis added).

"*Section 238.27 Relinquishment by one parent*

"*Neither parent may sign such release without the written consent of the other unless the other is dead* or hopelessly insane, or for one year immediately preceding has been under indictment for abandoning the family, or is imprisoned for crime, or is an inmate or keeper of a house of ill fame, or has been deprived of the custody of the child by judicial procedure because of unfitness to be its guardian, or unless the parents are not married to each other." (Emphasis added).

These statutes remain unchanged in our 1975 Code.

■ The record is undisputed that no written release was signed by Anh at any

time. We have repeatedly held that failure to comply with statutorily prescribed procedures is fatal to the power of the court to decree an adoption. *Catholic Char. of Arch. of Dubuque v. Zalesky,* Iowa, 232 N.W.2d 539, 544; *Stotler v. Lutheran Social Service of Iowa,* Iowa, 209 N.W.2d 121, 125; *In Re Adoption of Moriarty,* 260 Iowa 1279, 1286, 152 N.W.2d 218, 221. The affidavit stating Anh verbally released Binh to FCVN is ineffective for the purpose of adoption. The record is clear Anh did not intend to permanently sever her parental right to Binh's custody.

VI. Nelsons on this appeal next assert the trial court improperly considered whether Anh had given consent or release to adoption as the issue in the lower court was one of custody. The essence of their argument is that the trial court confused what was in Binh's best interests with the formal requirements for adoption.

█ Our determination of this contention is guided by general principles relating to relevancy. Relevancy refers to whether offered evidence has probative value in relation to the purpose for which it is offered. *Vine Street Corporation v. City of Council Bluffs,* Iowa, 220 N.W.2d 860, 862; *State v. Clay,* Iowa, 213 N.W.2d 473, 477.

█ Certainly, potential roadblocks to a planned adoption by Nelsons was relevant to the trial court's determination of the ultimate issue in this case—the best interests of Binh. The record shows the Iowa Department of Social Services considered Binh's best interests inextricably bound with the question of whether Nelsons would ever be able to adopt him.

The trial court did not err in considering the absence of either a valid release or consent to adoption. Both were relevant to determination of Binh's best interests.

VII. The remaining and ultimate issue which must be decided is this Vietnamese child's best interests. It is the issue most vigorously argued by counsel. It is the dispositive issue. We must determine whether Binh's best interests lie with Anh, his natural mother or with Nelsons who had cared for him since May 1975. To an unusual degree we are here faced with a difficult and perplexing set of circumstances. In addition to careful study of the facts we are here required to weigh and apply several different legal propositions.

There is a presumption of parental preference as to custody which exists by statute, Code section 633.559. It also exists by case law. *Hulbert v. Hines,* Iowa, 178 N.W.2d 354, 361.

The underlying rationale of this presumption has been articulated in several of our opinions. In *Risting v. Sparboe,* 179 Iowa 1133, 1136–37, 162 N.W. 592, 594, we state:

"* * *. Something more than the material things of life is essential to the nurture of a child, and that something is the father's and the mother's love, or as near its equivalent as may be. Recognizing this, the law raises a strong presumption that the child's welfare will be best subserved in the care and control of parents, and in every case a showing of such relationship, in the absence of anything more, makes out a prima facie case for parents claiming custody of their children. 'Indeed,' as said in one case, 'this presumption is essential to the maintenance of society, for without it man would be denaturalized, the ties of family broken, the instincts of humanity stifled, and one of the strongest incentives to the propagation and continuance of the human race destroyed.'"

█ Additionally we have consistently said brothers and sisters should not be separated and lose the benefit of constant association with one another without showing of good and compelling reasons. *In Re Marriage of Hagge,* Iowa, 234 N.W.2d 138, 139; *In Re Marriage of Woodward,* Iowa, 228 N.W.2d 74, 75, 76 and citations.

█ We are furthermore guided in the task before us by the principle restated several times that if a person having lawful care of a child has properly provided for a child's social, moral and educational needs for a substantial period of time and the child has become attached to that environ-

ment and those responsible for his welfare and happiness, a court is not justified in transferring that custody to another except for the most cogent reasons. *Halstead v. Halstead*, 259 Iowa 526, 531, 144 N.W.2d 861, 864; *Alingh v. Alingh*, 259 Iowa 219, 226, 144 N.W.2d 134; *Kouris v. Lunn*, 257 Iowa 1267, 1274, 136 N.W.2d 502, 506.

In applying these rules to the facts before us we find the presumption favoring Anh as the natural parent has not been rebutted by appellant Nelsons. There is no showing of parental unfitness; the record reveals Anh to be a woman of extraordinary courage, perseverance and full compassion for her child. Her odyssey which led her to Forest City bears testimony to this. Those who have visited Anh in her apartment stated she is a good mother who has made a rapid adjustment to her adopted country. Presently supported in part by money from her Methodist Church sponsor, Anh has secured a job with a hospital in Great Falls. The Nelsons never really contested Anh's fitness but rather stressed since Binh has been in their home for a substantial period that no cogent reason exists to return him to Anh. Under these facts we cannot agree. Binh was in the Nelson's home for approximately four months when Anh contacted FCVN requesting the return of her child. This was almost immediately after her arrival in this country. We do not find the time period substantial in this instance. Furthermore, a cogent reason is present here requiring transfer of custody—a natural native Vietnamese mother seeks her child who was temporarily released due to the exigencies of war.

We note that both the *Kouris v. Lunn*, supra, and *Alingh v. Alingh*, supra, cases relied upon by Nelsons are clearly factually distinguishable. In both, relatives retained custody of a child because the natural parent was unfit and had, in effect, abandoned the child for several years.

Our determination today is also necessarily based on what is likely to occur in the future as well as the immediate interests of Binh. The long-range interests as well as the immediate interests of the child must be considered. *In Re McGlasson*, Iowa, 195 N.W.2d 116, 118; *Stafford v. Taylor*, Iowa, 158 N.W.2d 621, 624. Anh expressed concern that her children learn the Vietnamese culture, accept their heritage and maintain family ties. There is evidence in this case that Binh's life with the Nelsons has caused him to avoid contact with a Vietnamese family in the community, in effect, rejecting his cultural and racial roots. We find that continued absence from his mother would probably result in further alienation from his heritage.

Dr. Robert W. Brindley, a psychiatrist, called as a witness by Nelsons, opined that if Binh were taken from the Nelson family and put in some other environment, it would be detrimental to the child's mental health. He expressed no other opinions.

The February 27, 1976 report to the trial court by State social worker, H. Jean Anderson (Exhibit A) includes:

" 'It is my personal feeling, without ever having met Doan Thi Hoang Anh, that she has the legal right to the child, and that Ben has the right to be raised by his own natural parent and with his siblings. I feel that any emotional difficulties which may arise could be handled more effectively by Ben in the setting of his natural family than in the setting of an adoptive family.' "

Under the undisputed facts two good homes are available to Binh. Nelsons have rendered exceptional service in his behalf. Their resistance to Binh's leaving their home is understandable. Under this record someone must be hurt.

We have studied the entire record carefully and find no ground upon which to reach any conclusion except that announced by the trial court.

We express the hope some contact can be maintained between Anh and the Nelsons once the transfer of Binh is accomplished.

The judgment and decree of the trial court is affirmed.

AFFIRMED.